The Judges delivered their opinions.*
Judge Carr.
It being agreed that the two suits between these parties are precisely alike in all their parts, I shall, for brevity, notice but one. The following- is a copy of the note, which is the foundation of the proceeding; “Norfolk, May 8th, 1806. Sixly days after date, I promise to pay to Caton & Veale, or order, at the office of discount, and deposit of the Bank of the United States at Norfolk (without offset,) six hundred and fifty dollars. Value received. (Signed,) William Hartshorne.” Catón fy Peale passed this note by a blank endorsement to Robert Gibson, who passed it by a blank endorsement, back to Caton & Veale, who then endorsed it in blank to the Bank of the United States. On the 12th of June, 1806, the officers of the Bank had this note protested for non-payment. In December, 1807, they sued Hartshorne on the note. In June, 1809, judgment was obtained, a ca. sa. issued, and returned non est inventus; Hartshorne having, before that time, removed to Baltimore. The Bank then brought an action of assumpsit against Calón & Veale, as endorsers of the note. Upon the plea of non assumpsit, a jury was sworn, who found a verdict for the plaintiffs. A new trial was granted. At the second trial, the plaintiffs introduced Jlrmistead, a juror in the first trial, to prove what Robert Gibson, since dead, had testified to at that trial. Jlrmistead “stated, at some length, and with considerable minuteness, *36 the evidence of Gibson; but said he did not pretend tore-peat his words, but to give the substance of his testimony, to the best of his recollection. Thereupon, the defendants’ counsel moved the Court to exclude the evidence, on two grounds: 1st. That %drmistead ought not to be received to prove the substance of what Gibson had said. 2dly. Thai Gibson himself, at the time he had given evidence, was interested and incompetent.
The first is an important question upon the law of Evidence. It was contended in the argument, that what a witness, (since dead) had sworn to at a former trial, could not be given in evidence, unless the very words he had used could be repeated and sworn to; and the dictum of Lord Kenyon, in Rex v. Jolliffe, 4 Term Rep. 290, was cited. That was a case of this kind. An information had been granted against the defendant for a misdemeanor as a magistrate. The case was sent down to be tried at Nisi Prms. Just before the trial was to come on, the defendant distributed several papers, vindicating his character, and charging the prosecutor with malice. On affidavits to the Judge of this fact, the trial was put off; and a motion Was made in the Court of King’s Bench, to which the affidavits had been returned by the Nisi Prius Judge, for a rule nisi, for another information against the defendant, for this attempt to prejudice the jury who would try the cause. The rule was granted. In shewing cause against it, the counsel contended that the affidavits taken at Nisi Prius could not be taken into consideration, because they were not taken in the same Court, nor. in the same cause. To this position, Lord Kenyon was entirely opposed. Among other things, he remarked, “ It has been said, that in no case whatever, can the proceedings in one cause be made use of in another; but the contrary is every day’s practice. In the Court of Chancery, depositions taken in One cause are frequently read in another, saving all just exceptions, &c. So in Courts of Law, the evidence tvhick a witness gave on a former trial, may be used on a sub *37 sequent one, if he die. in the interim; as 1 remember was agreed on all bands, on a trial at bar, in the instance of Lord Palmerston; but, as the person who wished to give Lord Palmerston’s evidence, could not undertake to give his words, but merely to swear to the effect of them, he was rejected.” Here, we see a clear anil explicit recognition of the rule. Lord Kenyon refers to a particular ease, where it “ was agreed on all hands” to be the rule. IIu then adds, in tho most, general manner possible, tho reason why, in the case referred to, the witness was rejected. Now, it would seem very strange, that Lord Kenton should lay it down as a general rule, admitted on all hands, and annex to it, in the same breath, a restriction which would, in ninety-nine cases out of a hundred, prevent its application; which would, in truth, destroy it as a rule; and yet this would he the effect, if we understand him to say, that what a witness (since dead) swore to in a former trial, cannot be given in evidence, unless the precise, identical words which he spoke, can be proved. A man who has listened attentively to a witness, especially a jury-man, (as here,) whose oath binds him to listen, may, if called upon within twelve months, (as in our ease,) give substantially a correct detail of what the deceased witness stated. But, if you call upon him to repeat the words, and to swear that they are the very words, no man, who had the least respect for his reputation, would venture to do it; unless he had written down the words at the moment of their delivery. Thus the restriction would destroy the rule. I should not believe that Lord Kenyon meant this, if there were no other cases establishing the rule; but there are many, which lay it down without any such restriction. Í will state a few of them.
Buckworth’s Case, Sir Thomas Raymond’s Rep. 170, (decided about 1668.) Information against Ruckworth, &c. for peijury in Ejectment. One was produced to prove what one that is since dead, swore upon She first 'Tuff ; mñ by .K.eiwng, C. J., it shall not be allowed, *38 cause betwixt other parties; but Twisden and Morton contra; and it was allowed. I understand from this brief note, that in a trial in a ease of ejectment, Buckworth committed perjury: that in prosecution for this, a witness was called to prove what one (since dead) had sworn to in the ejectment case (hence Kelvng-’s objection that it was “ betwixt other parties;”) but the evidence was received.
Pyke v. Cranch, 1 Lord Raym. 730, (about 1697.) It was resolved in a trial at bar, that “if a man was sworn as a witness at a former trial, and gave evidence and died, the matter that he deposed at the former trial, may be given in evidence at another trial, by any person who heard him swear it, at the former trial.” Here we find the rule very clearly expressed; and in such a manner as to exclude the restriction contended for. It is said that, the matter (not the words) of the deceased witness, may be given in evidence.
Coker v. Farewell, 2 P. Wms. 563. There had been an issue directed out of Chancery, which was tried at, law, and found for the plaintiff. A motion was made to the Chancellor for a new trial. He sent it to the law Judge to certify whether it was proper to be tried again; who certified that he should have thought it proper to be tried again, but that one of the witnesses examined for the plaintiff was since dead, by means whereof the plaintiff might suffer on such new trial; and that, therefore, he rather inclined against a new trial.
After this certificate, another motion for a new trial was made; when, the Master of the Rolls being in Court, the Chancellor desired his thoughts on this matter, and the Master said, “ the only objection to the new trial appeared to be the death of the witness; and though it had been said that the weight of a living witness would be greater than depositions, yet it was his opinion, that since this witness had been examined in the cause, and was dead, the depositions might be read; also, as the testimony which the .'fitness had given at the former trial, might be giver; *39 again in evidence against the same parties, he should rather think that, the other side had suffered by the death of the witness, since they had thereby lost the advantage of cross-examining;” and the Court ordered a new trial according-3y. Here we find the rule laid down again, without any qualification as to proving the words; and further, we see, that though a witness may have given a deposition in a Chancery suit, yet. if the Chancellor directs an issue at. law, and the witness is examined on that trial, and dies, the testimony which he then gave, may be proved in another trial of the issue.
Mayor of Doncaster v. Day, 3 Taunt. 261. A new trial was given, and counsel moved for a rule of Court, that if any of the witnesses should die, or become unable to attend, their evidences given on the former trial might he read on the next. Mansfield, C. J. “You do not want a rule of Court for that purpose. What a witness (since dead) has sworn upon a trial between the same parties, may, without any order of the Court, be given in evidence, either from the Judge’s notes, or from notes that, have been taken by any other person, who will swear to their accuracy; or the, former evidence may be proved by any other person who loill swear, from his memory, to its having been given.” This case, seems to me, to lay down the rule as broadly as any of the former. A Judge’s notes will furnish proof of the evidence. These notes, we know, never protend to contain the very words of the witness. The Judge notes the substance only of the facts which ho deems material. The same doctrine is also distinctly laid down as settled in White v. Kibbling, 11 Johns. Rep. 141, and Miles v. Ohara, 4 Binney’s Rep. 111. I think, upon the whole, that it is the doctrine both of reason and authority, that where a witness, who has been examined in a cause, dies, his evidence may be proved in any subsequent trial of the cause, if the person proving it will swear, that ho gives the matter substantially; though he does not. pretend fo ¿repeat the words e¿f the witness,
*40 If we examine Jlrmistead?s testimony, we shall find that it comes clearly within this rule. He stated distinctly the facts to which Gibson had deposed: that the two notes given by Hartshorns to the defendants, were in exchange for two notes of the same dates and for the same sums, given by the defendants to Hartshorne: that these last notes, after Harlshorne’s failure, were received by Gibson as one of his trustees: that Gibson was afterwards robbed of them, and that neither of the said notes had ever been paid by the defendants: that on his cross-examination, Gibson stated that the reasons which induced him to say that the notes were exchange notes, were, that as well as he could recollect they were the same in sums and dates, and he moreover well knew, that Hartshorne and the defendants were in the constant habit of exchanging notes for their mutual accommodation; but that he spoke of sums and dates from memory only. Jirmistead also stated, that he himself did not pretend to use the language of Gibson, but had given the substance of his testimony, to the best of his recollection. I conclude that the Court did not err in admitting this evidence; unless it should be, upon the ground, that Gibson himself was an interested and incompetent witness. Let us examine that point.
The defendants, the payees of the note, endorsed it in blank to Gibson; be, again, to the defendants; and they, to the plaintiffs. Was Gibson liable on this endorsement, to either the plaintiffs or the defendants ? If not, he was a good witness. We know, there are two classes of paper among us; the one governed by the law merchant, the other, by the common law as contradistinguished from it. To'the first class belong bills of exchange, and negotiable notes; to the second, bonds, notes of hand and other obligations. Bills of exchange (as Judge Roane says in Norton v. Rose, 2 Wash. 249) were always assignable. “ They did not owe this quality to statutory provisions,” but to the law merchant. From the same source spring those other rules, which distinguish commercial paper from all *41 ether; as first, that the holder has a right to resort to the drawer, and every person whose name is on the paper, each endorser being, as to him, a new drawer. Secondly, that the innocent holder of a bill holds it free from any equity existing between any of the former parties to it, (except in eases of usury and gaming,) this being necessary to its quality as a currency. The Statute of ¿Irme., having declared promissory notes, assignable in like manner as bills of exchange., has placed thorn in England on the same high ground. Lord Makswüu) says, (in Peacock v. Rhodes,) “The holder of a bill of exchange or promissory note, is not to he considered as the assignee of the payee. An assignee must take the thing assigned, subject to all the equity to which the original party was subject. If thfe rule applied to bills and promissory notes, it would stop their currency.” The law merchant, as part of the common law, is in force with ua, where it is unchanged by Statute. As regards bills of exchange, our Statutes have taken up the subject, and fixed them on the basis of commercial law. The Statute of Jiane was never in force with us. Promissory notes, therefore, which derive their commercial qualities from it, are left, with us, to stand on eomntou law ground; except that the Statutes incorporating the Farmers’ Batik, (1812,) extending the charter of the Bank of Virginia, (1814.) and establishing the North Western Bank and Bank of the Valley, (1817,) enact, 44 that all bills-or notes, negotiable at these. Banks, shall be placed on the footing of bills of exchange.” At common law, we know, that bonds, notes, and other evidences of debt, were considered as mere chosen in action, not capable in their nature of being assigned, so as to transfer the legal title. Tins assignee acquired an equitable interest, but subject to all the legal and equitable defences which could have bceu set up against the obligee or payee. Turton v. Benson, 1 P. Wms. 497. By Act of Assembly in 1705, it was enacted, that any person might assign a hind or bill for debt; and that the assignee might prose *42 cute a suit in his own name, allowing all discounts, &e. In 1730, this power of assignment was extended to promissory notes, classing them, in this respect, with bonds and bills. These Statutory provisions have been continued to the present day. Their effect on bonds, notes, &c. was very ably discussed and settled in the early cases in this Court. See Mackie v. Davis, 2 Wash.219; Norton v. Rose, 2 Wash. 233, and other cases, both in this and the Federal Court. These cas'es decided, that it was not the intention of the Legislature, to place bonds and notes on the footing of commercial paper; but merely so far to change the common law, as to enable the assignee to sue in his own name; taking the paper subject to all the equity of the obligor or maker.
There is another striking difference between common and commercial paper. Upon refusal of the drawee to accept, or of the acceptor or maker of a bill or negotiable note, to pay, the holder had only to get the paper protested, give due notice, and might immediately resort to any name upon it. With respect to bonds and common notes, it was seriously contended that there was no resort at all to any assignor; it being like the sale of any other personal chattel; but the Courts, on solemn argument, decided, that though the Act of Assembly gives no action against tho assignor, yet that such action results (on common law principles) from the debt which the assignment implies, and the promise which the law raises by the assignor to the assignee, that if the assignee (using due diligence) fails to recover of the obligor or maker, the assignor will re-pay him the consideration which he received for the paper. This implied promise, however, is decided to extend only to the immediate assignee, and to give to no other a right of action against the assignor; so that no assignee could sue a remote assignor. See in addition to the cases before cited, Mandeville v. Riddle, 1 Cranch, 290 ; Yeaton v. Bank of Alexandria, 5 Cranch, 49.
*43 Having thus pointed out some of the distinctions which characterise these two classes of paper, let us examine to which of them we must assign the note before us; and here there is no difficulty. It is a promissory note, payable Colon fy Ve.ale, or order, at the office of discount and deposit of the United States’ Bank at Norfolk, dated May, 1806, and payable in sixty days. At this date, all promissory notes in this State were mere common law choscs in action; evidences of debt, and nothing inore; and subject to all the common law doctrines before stated. This is evident from all the cases, both those before cited, and many others in our books. In some of these cases, the notes were exactly like the one before us. In others, they were made negotiable at Banks. Yet this could not change the law. This is shewn, not only by the judicial decisions, but also by the laws creating Banks, in 1812-14—17. These Acts expressly place notes made negotiable at the Banks created by them, on the footing of bills of exchange; which would have been a vain and nugatory thing, if such notes already occupied that ground. This, then, was a common note of hand, and the assignee could maintain no action at; law on it, against any, but his own immediate assignor. Catón 8? V»ale were the immediate assignors of the plaintiffs, and Gibson a remote assignor. Against; Gibson, then, the plaintiffs could bring no suit at law; and, if there were no other resort, he would, unquestionably, be a disinterested witness. But, it may be said, that though not. at law, the plaintiffs might recover of Gibson in equity; and the case of Riddle v. Mandeville, 5 Cranch, 322, may be cited. That was a case of a note very like the one before us; on which, the endorsee had first sued a remote endorser at law; and failing in that action, on the ground before stated, had filed a bill in equity against the samo remote endorser, and obtained a decree. But, this was expressly on the ground, that the remote endorser was fairly proved by the evidence, to bo liable to his immediate endorsee; and the Court considered, that this liability wa« *44 transferred in equity, though not at law, by the endorsement of that endorsee; and that this being an equitable interest, equity would, of course, afford a remedy. But the Court expressly declare, that in such case the defendant may defend himself as effectually in equity against the holder, as he could against his immediate, assignee, in a suit at law. Under this decision, and indeed upon the broad ground which distinguishes common from commercial paper, Gibson could not be liable to the suit of the plaintiffs, unless he would have been liable to Catón 8? Veale, his immediate assignees; and that to them, he would not have been liable is most clear, when we look at the note and observe, that Caton & Veale were the payees, and that they endorsed it to Gibson. They were then the endorsers of Gibson before he was their endorser; and the one liability balanced the other. Gibson, then, being liable to nobody on this note, was a competent witness.
Having shewn this, it may seem unnecessary to discuss the matter further; yet as the point was ably argued, 1 will add, that I doubt exceedingly, whether, under the circumstances of the case, the evidence could be objected to now, even admitting that there was such an interest in Gibson, as would have excluded him, if objected to at the first trial. His interest (if any) was apparent on the face of the paper. He stood on it,as endorser. 'With this fact before them, the defendants suffered him to be examined, and made him their own witness by cross-examining him. If, on this cross-examination, they had drawn from him evidence the most conclusive in their favor, they would have had the full benefit of it. Ought they then to be permitted, because they could not turn his evidence to their own account, to bring forward this objection, with a full knowledge of which they had made him their own witness, and thereby given him credit? See Turner v. Pearte, 1 Term Rep, 717. Again. If, at the first trial, the objection had been made, the plaintiffs, as the record shews, were ready to have released Gibson, and had given him *45 notice that tliey were ready; but no objection was taken. lie has died since; and if what he swore then, cannot now be proved, the plaintiffs are clearly deprived of his evidouce, by the admission of the defendants, at the first trial, that he was above exception. Whether, if Gibson had lived till the second trial, his evidence might then have been objected to, is a question which I have not considered, and which stands on somewhat different ground; for, then, the plaintiffs might still have executed a release. Bat after his death, there could be no release; for, it could not look back to the evidence formerly given. Upon this question, I give only the present inclination of my mind. The case does not call for an opinion.
Before quitting this subject, it rnay not be amiss to remark, that the Act of 1807, giving the right to assignees to sue any previous assignor, does not apply to this case; and if it did, would not vary the result, as it gives to the remote assignor the same defence which he would have, against his immediate assignee.
We come now to the other bills of exception; of which my examination will be brief, as the principles already discussed, will, in a great measure, govern them.
The Court instructed the jury, that there was no difference between the responsibility of the endorser of a promissory note payable at Bank, and the assignor of a bond for money not payable at Bank: that the failure of Harts-home, while he remained owner of valuable property, was not such insolvency as excused the plaintiffs from suing him; but, that if he was insolvent when the note became due, no suit was necessary. These instructions were not excepted to. It may be enough to say of them, that as general, abstract propositions, they are true.
The Court further instructed the jury, that if they should he of opinion that the notes were exchange notes, and that the one given by Caton & Veale, to Hartshorne, had never been paid, hut was stolen and lost, due diligence had nothing to do with the case, This was excepted to. *46 Was it erroneous ? I think not. Due diligence implies a suit against the obligor, except in cases where it can be proved that a suit would be useless. We have seen that insolvency is one case. Suppose it could be shewn that the note was a forgery; that the assignor had received the money, Sic. These cases would equally put the question of due diligence aside; because they would equally shew, that a suit would have been fruitless. Suppose it could be shewn, that in the assignment, the assignor practised a fraud on the assignee. This, I have no doubt, would make him immediately liable to the assignee, without any resort to the obligor. If we consider the passing these exchange notes as a fair transaction, the one is the consideration of the other; and not being commercial paper, the equity arising from the failure of the consideration, follows the note. If then, the note which Caton & Veale gave Hartshorne for his, was lost, so that they could.not be called upon to pay it, this would be a good defence for Hartshorne, in a suit brought against him by the assignees of Catón 8? Veale; and therefore, such suit would be useless. If it be objected, that Hartshorne had asssigned the note, before its loss, to his trustees, and that they might recover the money of Catón ¿¡' Veale, as on a lost note, the answer is, that they took the note with full notice of the nature of the transaction: that Gibson, one of the trustees, is the witness who proves thése facts, in order to charge Catón 8r Veale, on their assignment; and that they could never afterwards come on Catón 8f Veale. This is all predicated on the hypothesis, that the passing exchange notes is a fair transaction; and if these had been bills of exchange or negotiable notes, there is no doubt that the transaction would have been considered fair. See Rolfe v. Caslon, 2 H. Bl. Rep. 570; Cowley v. Dunlop, 7 Term Rep. 565; Buckler v. Buttivant, 3 East. 72; Sarrate v. Austin, 4 Taunt. 200; Bayly on Bills, 298. It is laid down in these cases, that counter acceptances are good mutual considerations for such *47 ,-.eceplances. Therefore, if two traders exchange aeccptances, and afterwards become bankrupt, each may prove the other’s acceptances under his commission, though the acceptances of neither he due at the time of such ruptcy. I have not formed a decided opinion, whether in common paper, the passing of these exchange notes should bo considered a fraud upon the public, so as to estop the. maker from setting up the want, or failure, of consideration, against the innocent holder. My brethren think it should have that effect. If so, it would not, follow that Catón fy Veale could say to their assignees, “ go upon Hartshorne. He and we have practised a fraud, and therefore, though he might resist us, ho cannot defend himself against you.” The law does not tolerate, that any person, from his own fraud, should raise up to himself a right; or by that fraud, should transfer to another a right, which he has not himself, and thereby protect himself. Taking it as a fraud, therefore, Catón &r Veale would he immediately liable to the plaintiffs, and thus, either way, the Court were right
The Court refused the second instruction asked for by the defendants, and rightly. It is an abstract proposition, not universally true; and, as I have just shewn, not true in this case.
The third was properly refused, because it was neither true, nor applicable.
The fifth instruction might have been wholly refused, for the reasons already given. The Court, however, gave it with a restriction, to which the defendants could not object.
The sixth instruction asked, was, “that if the jury should think the bail of Hartshorne was able to pay, the plaintiffs ought to proceed against the bail, and if not, that the defendants were not liable.” The instruction, thus generally asked, was properly refused; for, if it was unnecessary to sue Hartshorne, it could not be necessary to pursue Isis bail to insolvency. The, question, whether. *48 where a suit is necessary against the maker of the note, it is also necessary to pursue the bail to insolvency, is one of some importance; on which, as it was earnestly argued at the bar, I will give my present impressions. It does not seem to me necessary to take proceedings against the bail. All that is requisite to give the assignee recourse to his assignor, is to ascertain the insolvency of the maker. This, we have seen may be done without any suit. But, if it Were necessary to pursue th§ bail to insolvency, it would, on the same ground of reason, be necessary to ascertain, in all cases, whether the debtor could not give bail; and this could only be by suit. It would be still more clearly necessary, in every suit brought, to require bail; but this Court decided, in Harrison’s adm’r. v. Raine’s adm’x. 5 Munf. 456, that the assignee of a bond may recover of the assignor, after suing the obligor, and getting judgment, and a return of nulla bona, although the attorney endorsed on the writ in the first suit, that no bail was required. All the eases tell us, that a return of no effects, fixes the liability of the assignor; and yet in all cases, proceedings might be had against the bail. In the record before us, a ca sa. was taken out, and a return of “not found;” with full proof that the debtor had left .the country insolvent. Nothing could have established the fact of his insolvency, more clearly than this. ■ But it is said, this fixed the bail. What then? It imposed no obligation on the plaintiffs to pursue him. They had gone far enough in ascertaining the insolvency of Hartshorne.
The next instruction asked, is, “that the plaintiffs had no right to go into an enquiry, as to the consideration of the note.” The answer is, that the plaintiffs had an unquestionable right to go into such enquiry. The subject of the last instruction has been already discussed. The Court were right in refusing to give it.
I am clear, upon the whole case, that the judgment must be affirmed.
*49 Judge Green.
Gibson was clearly a competent witness. The note endorsed by him, not being negotiable, neither the Bank nor Catón By Veale could, in any possible event, claim any thing against' him; and as it was competent to the party to prove, upon the second trial, what he swore at the former trial, (he being then dead,) the substance of that evidence might be proved. For, if it were indispensably necessary to prove positively the very words of the witness, it would hardly be possible to do so in any case.
The question as to what diligence is necessary to be used by an assignee of paper not negotiable, turns upon the enquiry, whether a failure in that respect on the part of the assignee, could, by possibility, do an injury to the assignor.
If no such injury is or can, by possibility, be done, then no diligence is required, as if the debtor be insolvent, or the debt has been paid to the assignee. In this ease, there being no consideration for the notes exchanged, but the notes themselves mutually given, whilst the notes remained in the hands of the parties respectively, no action could have been maintained upon them by either party against the other. When Catón ¿y Veale assigned Hartshorne’s note to the Bank, for a valuable consideration, Harts-home was bound to pay the note to the Bank, because the note being given expressly for the purpose of enabling Catón 4’ Veale to raise money by discounting it, the advance of money by the Bank fo Catón 8y Veale, was virtually at the request of Ilartshorne; and as between him and the Bank, there was a valuable consideration. This right on the part of the Bank, was not derived from Catón 4* Veale* s assignment, they having no right to demand the amount of the note against Ilartshorne, who retained in his hands Calón fy Veale*s exchange note, without using it, fornearly two years after these notes were given. If, therefore, Catón 4’ Veale had paid the amount of the note to the Bankj, *50 at maturity, they would only have re-paid the money advanced to them upon the note; and every thing being in the state it was, when the notes were exchanged, they could have maintained no action against Hartshorne; and if the Bank had recovered in an action against Hartshorne, and he had paid the money, he could have- recovered against Catón Veale,Either upon their note in his hands, or as for money paid for them. The privilege on the part of the Bank to claim against Hartshorne, being their’s, and not Catón fy Veale’s assigned to them; and it being impossible that they could suffer any injury by a failure to assert this claim, no diligence against Hartshorne was necessary, in order to subject Catón Sr Veale as assignors. Nor does the assignment by Hartshorne, of Catón Sr Veale’s note to Gibson, in trust to pay his debts, near two years after the note was protested, at all vary the case. The moment the note was protested, Catón $? Veale became liable for its payment to the Bank; and that liability was an equity, on the part of Catón S? Veale, against their note in the hands of Hartshorne; and if the money had been paid by Catón St Veale, as it ought to have been, would have been a legal set-off against their note then in the hands of Harts-home; and if this equity would not have attached to it in the hands of a bona fide subsequent assignee, for valuable consideration, and without notice, it certainly would against an assignee with notice, as Gibson was. Indeed, he was not an assignee for valuable consideration. Neither he nor any other advanced any money t>r other thing, upon the credit of the note.
There was no obligation on the part of the Bank, to pursue Hartshorne’s bail. If they had, and he had paid the money, he would have had the right, by substitution, to stand in the shoes of Hartshorne, the principal, for whom he' paid the money, and to recover it from Catón <§r Veale,
I think the judgment should be affirmed.

 The President and Judge Gibbet, absent.